I'm Cynthia Fort and I represent John Martin. The counsel for my co-defendant, Ms. Brummer, and I are splitting the 20 minutes, 10 minutes each. I would like to reserve if we have a minute or two. You also may not be used to a southern accent. I'm from Nashville, Tennessee. If we're used to anything in the last three months, it's a southern accent. And how ironic, it's election day. First of all, I would like to acknowledge the standard of review would be that all of the facts should be taken in the light most favorable to the government with deference to the findings by the jury. However, in this particular case, I do not believe that a rational trier of fact could have found my client guilty beyond a reasonable doubt of conspiracy to deliver the cocaine in question. The basic facts of this case are a cooperating individual was arrested in Phoenix, Arizona. The DEA determined that they had previously had dealings with this individual. His name was Verdugo. They wanted to use him again to set up another deal. So they got Mr. Verdugo to contact a Mr. Buelna. And this all occurred in Phoenix, Arizona with the Phoenix DEA and FBI. Verdugo contacted Mr. Buelna. They had several conversations. They had several meetings. It was arranged for each to provide 10 kilos of cocaine. They made a delivery to each other like a meat. Mr. Verdugo, of course, had fake cocaine that was supplied by the government. He took the 10 kilos from Buelna, and the intention was it would be transported to Nashville, Tennessee, to delivery to a man supposedly named Rabbit. The agents took the cocaine, replaced the real cocaine with fake cocaine, and then... Oh, Calderon. Pardon me? Calderon. Yes, sir. And then proceeded to travel to Nashville by air. They arrived in Nashville, were met by our task force, a joint judicial task force group, and arranged a meeting spot for the delivery. The agents met at Shoney's. Mr. Calderon went inside. Eventually, an individual matching the description of to whom he was supposed to deliver the drugs came in. That individual was later developed to be Mr. Dobson, co-defendant today. When Mr. Dobson came into the restaurant, he requested that the agent go outside. How was the restaurant determined to be the site of meeting? Well, the testimony at trial was that Mr. Buelna made telephone calls to Rabbit in Nashville. That's Martin. That's your client. Allegedly. Rabbit, right? Allegedly. Well, didn't he admit that? Allegedly. Actually, he admitted to being called Fat Rabbit because that's his real nickname. And our nickname computer is Fat Rabbit. There are a lot of other rabbits, too, you know, people that go by Rabbit. But in this particular case, Buelna was overheard by the cooperating individual, Verdugo, arranging with Rabbit, you know, when they come to Nashville, what telephone number should they call, and so on and so forth. So that agent did that. And then Dobson arrived. The agent was hesitant to go outside. He made a telephone call to Buelna and voiced his concern. At the same time, Buelna was apparently on another cell phone or had another phone activated. And the agent stated at trial that he overheard Buelna say the word Rabbit. In other words, the inference was the agent was talking to Buelna about being uncomfortable and, you know, going outside to deliver. Buelna would have had a second phone talking to Rabbit, who supposedly was nearby. I didn't get. Who suggested this? Was it Shonley's or Shonley's Restaurant? I believe that the agent was told to go there. By whom? The Tennessee Judicial Task Force that was working with them picked up the agent. The agent called Buelna. Buelna supposedly called Rabbit, who told them where to go, who said my man will be at the Shonies. I believe that's the way it went. And that was given back to Calderon. But the idea, because I tell you Calderon hadn't been to Nashville. No, he had not. Well, I don't think. I can't say that categorically. So it was Rabbit or Martin who said go to Shonley's, right? Yes. And Buelna had been to Nashville previously, but it was my understanding and I may be, you know, corrected, but I believe it was like a triangle of telephone calls, you know, going between the parties with no direct communication between my client and the agent. There is an allegation that there was a black suburban circling this area, parking across the street eventually behind a Kinko's. Not an allegation. It wasn't pleaded. It was testified to. It was testified to. It was testified to. And the testimony said or indicated that my client was the driver. One of the agents said he actually drove by and saw him. Of course, we argued that that was impossible because of the height and distance and darkness, but the jury accredited that fact and found it apparently. The meeting with Calderon and Dobson had a brief intermission. When Dobson left the building, went over to this vehicle, got in it, got out, and came back into the Shoney's. At that point in time, Calderon agreed to go outside and make the exchange. Then my client supposedly drove off. Dobson drove off in a second vehicle. There was an interdiction on the interstate very near this restaurant. Dobson was cited, released, but the drugs were confiscated. That all occurred in November of 2001. The investigation, you know, was being flushed out by the officers in Nashville as well as the Phoenix CEA. They wanted to establish who the person was that was Rabbit. They got a plate off the or a number off the plate of the Suburban. They ran it. It came back to John Martin. They then got a search warrant, went over to his place of business. And as an aside, Dobson and Martin are related. Dobson is my client's uncle and they're business partners. They searched. They found a cell phone in the Suburban that had calls correlating with calls placed to Buelna at the night of the exchange. They later in March came back and did a traffic stop and arrested Martin and Dobson. They were extradited and subsequently tried in Phoenix. We acknowledge that circumstantial evidence can be used to prove the agreement in such a case like this, a drug conspiracy case. And we also acknowledge that in most of the drug conspiracy cases, there are inferences from circumstances and associations that provide evidence of the agreement. We contend that the evidence is insufficient in this particular case to even draw the inference that my client was Rabbit, because, yes, you did admit to being called Fat Rabbit, but the way they arrived at his nickname was by running the DMV, the plate, getting his DMV photo, which sat on the desk of the investigating officer, of one of the investigating officers, the officer who said he observed the Suburban and thought he could ID the person, walked by the desk and saw that one photo, said, Who's this? They said, That's Rabbit. Okay. That's highly suggestive. There was no motion to suppress. Unfortunately, there was no motion to suppress. I was also retained at the sentencing hearing level. My client had three previous appointed attorneys at trial level. But anyway, so Dobson is clearly present. He has a relationship with my client. It's not unreasonable to think that when they're both sitting in the Suburban that the cell phone that's found could have been Dobson's cell phone that Dobson used that night from the restaurant. There were no taped conversations of what activity occurred when Dobson left the restaurant and went to the Suburban and then returned. There was no testimony of, you know, any, like, handing off of the money. The proof was that my client would have given Dobson the money at that point in time. There was no evidence that Dobson didn't have the money when he first arrived at Shoney's. There was no evidence that anybody saw him taking money, you know, while in the Suburban or through a window or anything like that. There was testimony that Rabbit would have the money at the scene. What is the explanation, the innocent explanation, for Mr. Dobson going in the restaurant, asking Calderon to leave, Calderon saying, No, I won't go. I'm going to stay in here. This is where I've been told to go. Dobson goes out and speaks to Martin. Then he comes back in again and tries to get him to go out. No, I won't leave. And he goes out and speaks to Martin again. What business or other thing other than the drug deal was going down? Well, first of all, our contention is the proof was insufficient for the jury to find that that was actually Martin in that Suburban. Secondly. Well, suppose the proof is sufficient to find that it was Martin. I just didn't want to conceive. Secondly, as far as the proof of what was going on, an inference could be drawn that Martin was giving instructions. But as I stated earlier, there are no tape-recorded conversations indicating what was happening. They're business partners. He could have seen Martin's car there. Or Martin could have seen Dobson's car at the Shoney's. And because Dobson's a known drug dealer, was hesitant to pull up and get involved in anything. Was there any innocent explanation for these repeated trips by Dobson to Martin given it to the jury in an argument? Not to my knowledge. Okay. There was no proof on the behalf of the defense. And furthermore, the agents, I mean, the agents testified to the observation of the vehicle moving, Dobson's entering and leaving. That was independent surveillance by the task force, the Tennessee Judicial Drug Task Force. Calderon obviously was inside the restaurant and unaware of the movements of Dobson outside. He did not state, you know, where he went or what he did. So you've got an agent parked across the street in a car watching a man who he believes to be Dobson go to the Suburban, get out, come back, the Suburban drives off, and then it comes back. But the basic argument that we have is the inferences are tenuous and that we believe that it would be natural for the telephone to be found in the Suburban because it was Dobson's and Dobson was in the Suburban when it was found. But that's really not enough or doesn't rise to the level of proof to determine that my client was actively involved or had participated in any sort of conspiracy  Thank you, counsel. Why don't we set the clock at 10 so she has a full 10 minutes? Good morning, Your Honors. Florence Bremer appearing on behalf of Steve Dobson. As you know, Mr. Dobson was charged with a conspiracy charge. In order to uphold a conspiracy charge, you need an agreement and intent, neither of which the government demonstrated or which adjudicated. A rational jury would find that to be demonstrated. What the government did demonstrate was that Mr. Dobson was, number one, unwitting or a dupe or a patsy, and number two, he never knew that there was cocaine in the bag or that this was to be a cocaine transaction. He didn't have to know it was cocaine. He would have to know that it was some illegal drug. Is that right? Right. But there's no evidence that he knew it was an illegal drug, which is why we cited to the Agdalwa case, I-D-O-W-A, which is a Third Circuit case, which says if someone thinks it's some other kind of contraband or something innocent, that can be a reasonable explanation, but the government doesn't make the jump to say this is drugs. All it has is Mr. Dobson picking up a bag. So he can't say that. Excuse me. Sure. This is probably harsh on your ears, but at SCR 81, the undercover agent said that the Dobson said, quote, in this case, what was the name that Mr. Dobson used for the drugs, for the goods? And he said, quote, answer, I believe he used the word shit. Yes. Isn't that sufficient evidence to find that he didn't think it was something innocent in the? Well, possibly, but at the same time, it doesn't demonstrate that it's drugs. Well, wait a minute. Can a reasonable trier? This is Rule 29. Appeal from Rule 29, denial, right? Right. The only question is, can a reasonable juror, suitably instructed on this evidence, find, based on this testimony, that he was using the word, street word, shit, for drugs? Can't he find? Isn't that sufficient? No. Not based on the totality of the evidence. Because, first of all, we have testimony at trial from the agent. But is the question on the totality of the evidence? Are we here to reweigh the evidence, or are we here to analyze whether there was sufficient evidence from which a single piece of evidence, a reasonable trier fact, could have been found beyond a reasonable doubt? He may have disbelieved, as strange as it might seem to you, everything that Mr. Dobson said other than that. Yes. That is the standard. But, first of all, although the agent testified that, excuse me, that the word shit might be a word that could stand in for drugs. That might be a word. And is that a common term for illegal substance? Answer, yes. That's not might. Uh-huh. Well, at the same time, it can also stand for other stuff as well. And I think the reasoning from Paying $9,000 for real feces? Well, here you go. With the $9,000, it's very important. Well, I wasn't implying that it was feces, but more along the lines of Something else illegal. I really wasn't anticipating this to be part of the argument today. But more along the line that maybe it could have been CDs. Maybe he opened a container of beer, right? CDs, DVDs. I mean, there was testimony at trial where the agent testified about, you know, could it have been referring to CDs or some sort of contraband, jewels, something like that. And that was the same reasoning that was in the Adawa case. What, if you look at the other stuff, first of all, the agent, he meets Dobson. The first thing he says is, this guy is an unwitting. After he has all transactions with Dobson, he's reviewed him. What does he say afterwards? He says, this guy is an unwitting. And at trial, he states, well, an unwitting is, I don't really mean unwitting. I meant he wasn't a ringleader. Although there's testimony by another agent who says an unwitting is someone who doesn't have anything to do with, with, with any, with anything. There were two. Kennedy. Could you have called Mr. Calderon and asked him the question, do you, have you formed an opinion, Mr. Calderon, as to whether he was witting or unwitting? Would that be objected to as opinion testimony, not from an expert? Well. Because it has to do with knowledge, not anything else. So why can't we just disregard that as a bad choice of words? Well, first of all, in the Maris case, where there was an agent who testified that drug, there was a lot of testimony by agencies about what drug dealers do. And that was considered by the jury. And in the Maris case, there was testimony about a, an individual who was supposedly doing counter surveillance. And there was testimony by the agent who says, well, drug dealers do counter surveillance. And the court used that in their, in affirming that the evidence was sufficient. And if this sort of expert testimony is going to be relied on about what drug dealers do, evidence regarding whether someone is witting or unwitting that's testified by an agent should be allowed in as well. There was also testimony that drug dealers often employ dupes. And there's very consistent evidence about what Mr. Dobson does which demonstrate that he is a dupe. For instance, he stops for the police. He's a, in the cases that we cite, the cases regarding conspiracy, I think they can be summarized into four categories. There's cases regarding counter surveillance. There's cases regarding relationship. There's cases regarding knowledge. And there's cases regarding coordinated activity. And when the court does their weighing, those are basically the four categories that are looked at. And first of all, Mr. Dobson stops for the police, shows no knowledge. There is no mention by, of Mr. Dobson by anyone. Verdergo, who needs to give good information to the government to hopefully help his sentence, he's never heard of Dobson. Mr. Dobson doesn't do any counter surveillance. There's a vehicle in the Shoney's parking lot that is the suburban, which is Rabbit, whoever Rabbit may be, that is apparently doing counter surveillance, driving around, looking around. Dobson walks in. He sees this guy sitting there. Hi, my name is Steve. He's, and he actually, he shortchanges the agent, the agent when he gives him the money. Because first of all, he's picking up, supposedly picking up between $250,000 to $400,000 in cocaine. He's there with, well, which he doesn't have initially, there with $9,000. I think that can demonstrate from a similar to the Idawa case that he might be dealing in some sort of other contraband. He's there with $9,000. First, and the second thing is the courier fee was $15,000. So he was shortchanging Calderon. And that's consistent with a dupe. Was there any evidence where the odd $6,000 turned up? No. There was no evidence. It was just the 9th. It was more like $9,300, $9,400, but significantly less than what this courier fee was supposed to be. So that's consistent that they're going to send a dupe in who's going to shortchange this guy who's supposed to be a known drug dealer. May I reserve the rest of the time? Certainly. Thank you. Good morning. My name is David Pemsner. I'm an assistant U.S. attorney from the District of Arizona. I was one of the trial prosecutors in connection with this case. There were a couple of statements that were made that I believe are inconsistent with what the evidence proved at trial. And I would, as I go through the facts, I would like to, I will point those out. Specifically, to start out, Mr. Verdugo, the confidential source, didn't set up this deal. He learned that Mr. Buelna had 10 kilograms of cocaine in October of 2001, and he learned that Mr. Buelna, Mr. Buelna told him he's sending it to his customers in Nashville. The name that came up later was the name Rabbit, and that's who his customer was. We learned that Mr. Buelna was looking for a car with a hidden compartment. So the agent told Mr. Verdugo, well, try to learn where that hidden compartment car is. When it appeared that car wasn't going to materialize, the agent came up with a new  plan, and the new plan was tell Mr. Buelna you also have 10 kilos of cocaine and ask if he can, if he can also ship it with his and that Mr. Verdugo will supply the courier. And the courier was Agent Calderon. Agent Calderon and Buelna and Verdugo met in Phoenix before they left, and it was decided that he would be paid courier fees after he arrived in the amount of $15,000. He was never intended to get the full payment for $400,000 plus of cocaine. It was purely courier fees. The cover was that Agent Calderon was working for Verdugo and had done this in the past for Verdugo. So that's the premise of how this case set up. The agents then traveled back to Nashville, Tennessee, and to answer your questions, it was the agents that decided, Shoney's, the local agents would be the, that would be the best location. That was Calderon. No, it was actually my, the agents in Nashville suggested it to the Phoenix agents that that's where they should complete the transaction. And there was a little confusion over the telephone calls at that point. On November 18th, 2001, Agent Calderon calls and speaks to Buelna and says, I'll be in Nashville on November 19th. That's when I'm ready to deliver the cocaine. So now we know that the cocaine will be arriving on November 19th. The agent then on November 19th calls again and speaks to Buelna. This is not, there was a little confusion as to whether Dobson was already at the restaurant when that, the November 19th call took place. He wasn't. The agent called and told, was telling Buelna that he was going to be at the Shoney's. During that call, Buelna picks up his cell phone, because he was speaking to the agent on Verdugo's cell phone, and he dials a number. The number he dials was the phone number that was found in Mr. Martin's vehicle at the time of his arrest, the same phone that was only unlocked by using the four digits of Mr. Martin's last four numbers of his Social Security number. That's how the agent accessed that phone. He calls and says, Rabbit, and he relates the information to Rabbit. So he's talking to two people now. He's got the agent on Verdugo's line, and he's talking to Martin on Buelna's line. He tells Buelna, or he tells, excuse me, Martin that it's at the Shoney's. He next, the agents go, well, who am I going to meet? And the agent could overhear him saying that he's referring to the person as Rabbit. And it's been, the evidence clearly demonstrates that Rabbit is John Derek Martin. There was an, a law enforcement officer said he's, he has known Mr. Martin as Rabbit since 1993, that at the time of his arrest, he was asked after his Mirandize, do some people call you Rabbit or Fat Rabbit? His answer was yes. So he even admitted in 2002 that he was called Rabbit or Fat Rabbit. And his phone, the phone that Buelna contacted Rabbit on was found inside the Suburban that Mr. Martin owned. Now, the agent goes, who am I meeting? So he gets relayed through Buelna. You're meeting a black male driving a black car wearing black clothing. So the agent goes into the restaurant. What's the logical inference of the fact that the, that Rabbit relayed the exact description of Mr. Dobson at that time? Because Mr. Dobson was dressed all in black and was driving a black car on that day. And the logical inference is they knew they were going to be meeting Mr. Agent Calderon to pick up the cocaine at that point in time. They already had met and decided that Mr. Dobson was going to be the person to go to the restaurant, that Mr. Dobson would make contact with the agent. And so the agent goes inside and Mr. Dobson appears and he walks in the restaurant and he tells the agent, Rabbit's nearby, he has your money. And he tries to get the agent to leave. The agent's not going to leave because surveillance and all the security is around Shoney's. He's not going to go to an unknown location. The agent tells Mr. Dobson, I'm not going to leave. I don't want to do the deal in the restaurant. What's Mr. Dobson's response? It's not some unwitting that he's just there to say, hey, Rabbit's across the street or Rabbit's nearby. His response is, this place, it's not safe. There are too many cops here. So he tries to convince the agent to leave. The agent says, I'm staying here. What does the evidence show next? That Dobson leaves the restaurant. He comes back a short time later and he is on a cell phone. And it's the same cell phone. It's not the one that Buolna called Martin to get the location of the restaurant, but it's a different cell phone. It's the same phone that was found in Dobson's vehicle later that day. The evidence showed, and it's in the SRERs, that the call was placed from Dobson's cell phone to Buolna's phone in Phoenix, Arizona. We now have direct coordination between Mr. Dobson and the source of supply back in Arizona. He walks into the restaurant. He hands the phone to the agent, and Mr. Buolna's on the phone. The agent has a conversation with Mr. Buolna. During this conversation, Mr. Buolna's trying to get him to leave the restaurant. The agent's saying, I'm not leaving. I'm not leaving. So what happens then? Mr. Dobson leaves the restaurant, walks immediately across the street to behind the Kinko's, and gets in a car that was registered to Mr. Martin. It wasn't learned that it was registered to Martin until at a later date. Mr. Martin is, while there are two people sitting behind the, in the suburban, an agent sees, Agent Bagot sees, at that point, Mr. Dobson hand the phone to Martin and it appears that Martin's now speaking on that telephone. At that point, Agent Hardcastle and Agent Goodman decide to come around the Kinko's to get the license plate number. As they're coming around the corner, they came upon the car very quickly, and Agent Hardcastle testified that Mr. Martin turned and looked at him. He got a full facial view, and he positively identified him later through a known driver's license number and also in court. Agent Goodman didn't get a look at the driver at that time that they came around the Kinko's. What happens? There was no photo lineup, right? There was a photo lineup with Agent Bagot, who was also in that same parking lot but a little closer to a Kmart. Agent Bagot saw that whole encounter with Hardcastle and Goodman coming around. Agent Bagot was a distance away, and he later identified Martin through a photo lineup. And I'll explain how that came about. But so Agent Hardcastle is absolutely correct. It was a he saw the photograph on the desk of Agent Goodman and said, hey, that's the guy that we saw back on or at the Kinko's. And that was how the identification took place. The what happens then is Dobson and Martin, they pull out in the suburban, they drive through the Kinko's parking lot, they go out on a street, they drive through McDonald's lot, and Martin drops Dobson off behind the Shoney's. What happens then is now Dobson, after he meets with Martin, has the cell phone, a different cell phone that he had had the original communication with Boelner, but he has a cell phone that Boelner called Rabbit on. And so what's the logical, reasonable inference? That he obtained that cell phone from Martin as they were driving around to the back of the Shoney's. He walks in and he hands the phone to the agent again. This time it's Verdugo who's supposed to be, that the agent's supposedly working for. Verdugo's inquiring why isn't he leaving, what's going on. The agent said, I'm not leaving, I'm not moving from here, you know, this is a safe place, not leaving. So what happens is Dobson leaves the restaurant, walks out of the restaurant, and he doesn't see Martin right away. Why? Because Agent Baggett testifies that Martin now is doing heat runs. He's going all through different parking lots, in and out of parking lots, around the buildings, and he's looking, and the agent testified that it was an obvious attempt to conduct what he called heat runs or to look for police surveillance. And in fact, during one of his encounters, as he was driving through the parking lot, where Mr. Agent Baggett was, the agent was turned to the side, he turned around just as Martin was pulling right in front of his vehicle. Martin slows, looks at him. The agent turns and he doesn't want to blow his cover, so he waves at Martin to act like he's just nonchalantly there. He got a good one-on-one view. Later, after they got the MVD photo, Agent Goodman prepared a six-man photo array, showed it to Agent Baggett, and Agent Baggett identified Martin from the photo array, and he also identified him in court. So we have three agents or two agents at that point that identified Martin as the participant here. So Dobson doesn't see Martin. He goes back in the restaurant. He hands the phone to the agent again, and it's the evidence show it's all one call. He never terminates that call. And the evidence also shows that now it's Buelna back on the phone. And Buelna, and it's in the excerpts of record for the SCRs for Martin, but the agent testified that at this point Buelna, and it's at page 106 of Martin's excerpts of record, and he says, he tells him, I'm not leaving the restaurant, and Buelna's going to lose this deal, that the agent was upsetting his customers, and there's nothing to be afraid of. He knew these guys. Everything was okay. They were okay, and there was no problem with them. Well, we have Buelna in Arizona vouching those guys, Mr. Dobson and Mr. Martin, the only two people who were involved in this transaction. So we have extreme coordinated effort between all the parties. We have calls being placed between, between, during the course of this event, between Buelna in Phoenix and Martin's phone, Buelna in Dobson's phone, between Dobson and Martin's phone. So there's all this coordination going on. When the, when at that point, when, after he tells Buelna, and this is like the fourth meeting now, I'm not going to leave the restaurant, that's when they hang up the phone, and what happens is Mr. Dobson proposes the compromise. The agent clearly testified. It was Mr. Dobson's idea, we'll do it in the parking lot. I'll bring the stuff in the bag or bring the money in the bag, and you bring me, and then I'll take your bag, and we're done. So it was Mr. Dobson who came up with the idea, okay, you're not going to leave the restaurant, let's just do it, and you're not going to follow me somewhere else, do it in the parking lot. The agent said, I need a little time to think about it, because he's got to alert the others that there may be a change in the plan. Even the evidence shows, and it's in the SCRs, and it's in, and this Court granted my motion to extend the record to allow the transcripts to be considered, and it's in the transcripts that while, after the termination of the call with Buelna, there's another phone call to that phone that Dobson had, and Mr. And it's from Buelna's phone again, and then Dobson gets up and leaves. So there's more communication, more than just that one phone call. There were at least two calls between Buelna's phone and the phone that, three calls between Buelna's phone and the phone that Dobson was using. What does he do? Well, first of all, at the very beginning, he tells the agent that Rabbit has the money and he's nearby. He tells the agent he doesn't have the money, that Rabbit has it. What does he do? Then, after that fourth meeting, he goes and meets with Rabbit at a gas station behind the Shoney's. He gets in the car. They see the cell phones passing off. They see him hand the cell phone. It would have been the phone. It would have been Martin's telephone. And he then gets out of the car, goes to his car, and drives up to where the agent's vehicle is parked. At that point, the agent comes out. Mr. Dobson's sitting in there in the car, and the transcripts prove it out, but he's holding in his hands bundles of U.S. currency. The agent, during that encounter, says, do you have my 15 large for me? His response is, I didn't count it. I don't know what this is. They just gave it to me. The inference was, he just got it from Martin, who he said had the money all along, and he was there to deliver the courier fees. The agent hands him a paper towel, the paper, and he then, Dobson places the money in a paper towel. The agent puts it in his pocket. And all the time, Dobson's saying, this isn't the right place to do this. This is bad. There's highway patrol inside. There's police all around. And the agent goes, do you want the bag? And he goes, yes. He goes, Dobson goes, and he actually grabs the bag out of the agent's vehicle, throws it in his car, and takes off. So we have, at this point, we have the surveillance units on Dobson. Dobson is stopped. He denies any knowledge of the bag or he didn't know anything about it, he said, which was a lie, because he just picked up the bag. He knew about the bag. He just got it from the agent. But he just denies everything. At that point in time, you have Martin following in almost a security role, following right past where the stop was, looping off at the next exit to go back around the scene. And it's at that point that Agent Goodman gets a good view of Mr. Martin driving the vehicle and makes a positive ID of Mr. Martin. So what we have, we have some red herrings thrown out. We have the use of the word unwitting. And the agent did use the word unwitting after the very first meeting, the very first brief meeting, when Dobson said, Rabbit's got the money nearby and he wants you to leave. And he said, there's too many cops here. Well, the agent says unwitting. He said, that was the wrong choice of words. What I should have used was, it wasn't the principle. He was expecting to meet Rabbit. But he used the word unwitting. And he used it twice during that conversation over the radio after the first meeting. Contrary to what defense counsel claims, he never used the word unwitting again after the conclusion of all the transactions. That didn't happen. The only thing, he used it twice, but it was only immediately after the very first meeting. So to say he continued to describe him as an unwitting individual even afterwards is not supported by the evidence. We have the whole set of cases that they see. Basically, we have extreme coordinated conduct between all three individuals to pick up what was purportedly 20 kilograms of cocaine. The knowledge and intent can be inferred from all the surrounding circumstances. There is no contention that there wasn't a conspiracy to distribute or to possess with the distribute cocaine. Both counsel are basically saying, well, it wasn't really my guy, or you just didn't show he was connected enough, or on Mr. Dobson's behalf, he was just an unwitting dude. Well, his actions betray that. His actions demonstrate that he had knowledge of what was occurring, that he acted with the intent to complete this offense, and he was a – he was, we believe, acting on Mr. Martin's behalf. You have the family relationship here. They're uncle and nephew. This is a close relationship. This is not a – somebody that got off the street. We have that. We have the fact that they were coordinating all their efforts, and I believe that all of that together shows that there was enough evidence to demonstrate specific knowledge. How do you deal with a DAWU? Obviously, that's not the law of our circuit. But assuming that we were to adopt Chief Judge Becker's opinion, how does that apply to this case? Well, I believe you can impute knowledge based on their conduct, and that's – I mean, you don't describe – I mean, well, one, we don't have to disprove every possible theory or hypothetical as what it could be. Secondly, you don't – with the totality of the circumstances, you have Dobson negotiating and discussing what's going on with the source of supply back in Arizona. This was a cocaine conspiracy. It wasn't anything else. To suggest it was videotapes, to suggest it was DVDs is just total imagination, not supported by any evidence at all. What the evidence supports is Buolna was supplying cocaine to his customers in Nashville. These two were the only people that were involved in trying to pick up the cocaine. And their efforts, their tandem efforts and their joint – their common communication supports the fact that they were – they had the knowledge that this was a cocaine conspiracy and the intent to accomplish it. Any further questions? Thanks. Ms. Ford, if you want two minutes, we'll give you two minutes. Okay. Thank you. Even based on the argument given by the government today, the only thing we have Dobson doing is coming to the agent and saying, come outside, and then he becomes a cell phone delivery person, delivering the cell phones from the suburban and to the agent. And he is not part of the transaction. There's – in the transcript that was submitted by the government, I wanted to clarify something. That transcript doesn't have the second time where the agent says that Dobson is unwitting. We've cited in our brief, and I couldn't find it while opposing counsel was talking, he testifies to saying it after everything is over. And we only have – we have a portion of the transcript, and that was one of the reasons why we asked that the court review the videotapes and audiotapes, to make sure that everything was included in there. One of the – we cite many cases which demonstrate that the cases where the court reverses, those are the types of – that's the type of evidence that the court looks at. And, in fact, there's – Judge – we're pleased to see that Judge Fletcher is on this, because she has tons and tons of experience in conspiracy cases. And there's cases that we cite that are distinguishable from cases that she's actually ruled on. For example, just to give one example in my last 30 seconds, there's the Taylor case where sufficiency is held up. But in that case, there's – the defendant has bought equipment to make methamphetamine. He lived with the other defendant in a house that had methamphetamine, and he said he wanted to shoot it out with the police. Mr. Dobson was a dupe in this case. And a few more things to point out. He never looks in the bag when he gets this money. He has no drug ledgers, and he has no paraphernalia. It was not reasonable that he was found guilty, and we ask that the court reverse. Thank you. Thank you, counsel. The case just heard will be submitted. And thank you all for traveling here midweek to present this case to us. The final case on the oral argument calendar this morning is United States v. Gonzalez-Corporan and Serino. Mr. Carr? May it please the Court, Jason Carr.
judges: B. Fletcher, Thomas, Bea